Nos. 21-2218 (L), 21-2219

_____

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

_____

BLUE FLAME MEDICAL LLC,
*Plaintiff-Appellant,*

v.

CHAIN BRIDGE BANK, N.A.,
*Defendant and Third Party Plaintiff-Appellee,*

JOHN J. BROUGH; DAVID M. EVINGER,
*Defendants-Appellees,*

v.

JPMORGAN CHASE BANK, N.A.,
*Third Party Defendant.*

*(Caption continued on inside cover)*

_____

Appeals from the United States District Court
for the Eastern District of Virginia (No. 1:20-cv-00658-LMB-IDD)

_____

## BRIEF FOR APPELLANT BLUE FLAME MEDICAL LLC

_____

Eric F. Citron
Kathleen Foley
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20814
(202) 362-0636
ecitron@goldsteinrussell.com
kfoley@goldsteinrussell.com

*Counsel for Appellant Blue Flame Medical LLC*

_____

BLUE FLAME MEDICAL LLC,
*Plaintiff*,

v.

CHAIN BRIDGE BANK, N.A.,
*Defendant and Third Party Plaintiff-Appellee*,

JOHN J. BROUGH; DAVID M. EVINGER,
*Defendants*,

v.

JPMORGAN CHASE BANK, N.A.,
*Third Party Defendant-Appellant.*
_____

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __21-2218(L__    Caption: __Blue Flame Medical LLC v. Chain Bridge Bank, N.A.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Blue Flame Medical LLC__
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                       ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Eric F. Citron     Date: Dec. 22, 2021

Counsel for: Blue Flame Medical LLC

Print to PDF for Filing

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTION .............................................................................. 1

STATEMENT OF ISSUES ................................................................. 1

INTRODUCTION ........................................................................... 2

STATEMENT OF CASE ................................................................... 4

I.   Legal Background ................................................................... 4

II.  Factual Background ................................................................ 8

   A.  Blue Flame's Creation and California Contract ........................... 8

   B.  Blue Flame's Supply Arrangements ....................................... 11

   C.  Blue Flame Picks CBB as Its Bank for the Express Purpose of Handling This Transaction. ................................................. 13

   D.  CBB Fails to Fulfill Its Role in the Wire-Transfer System. ......... 15

   E.  Subsequent Developments .................................................. 23

III. Proceedings Below ............................................................... 25

SUMMARY OF ARGUMENT ........................................................... 28

ARGUMENT .............................................................................. 31

I.   CBB Is Liable For Knowingly Wiring Funds Out Of Blue Flame's Account Without Authorization. ................................................. 31

   A.  The District Court Misinterpreted §4A-204(a). ....................... 32

   B.  The District Court Erred in Finding Blue Flame's State-Law Claims Preempted. .................................................................. 38

II.  The District Court Usurped The Role Of The Jury In Concluding That Blue Flame Could Not "Establish" Damages. ................................ 40

   A.  The District Court Correctly Found That CBB Violated §4A-404(a). ... 41

   B.  The District Court Impermissibly Resolved Factual Disputes and Drew Inferences Against Blue Flame ....................................... 45

      1.  The evidence that California would have immediately canceled the entire contract absent CBB's §4A-404(a) violation is equivocal at best. ........................................................ 46

i

    2.   There is substantial evidence Blue Flame would have successfully fulfilled some or all of California's order..........................49

  C.  The District Court Ignored CBB's Ongoing Violation. ..............................54

III. Summary Judgment Was Unwarranted On Blue Flame's Tortious-Interference Claims.............................................................................55

CONCLUSION .........................................................................................56

REQUEST FOR ORAL ARGUMENT ....................................................56

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................. 31, 45

*Banque Worms v. BankAmerica Int'l*,
  570 N.E.2d 189 (N.Y. 1991) ...................................................7

*Dennis v. Columbia Colleton Med. Ctr., Inc.*,
  290 F.3d 639 (4th Cir. 2002) ................................................45

*Eisenberg v. Wachovia Bank, N.A.*,
  301 F.3d 220 (4th Cir. 2002) ................................... 26, 38, 39

*First Sec. Bank of N.M., N.A. v. Pan Am. Bank*,
  215 F.3d 1147 (10th Cir. 2000) .............................................7

*Gold v. Merrill Lynch & Co.*,
  2009 WL 2132698 (D. Ariz. July 14, 2009) .......................27

*Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  597 F.3d 84 (2d Cir. 2010) ...................................................27

*Martin v. Duffy*,
  977 F.3d 294 (4th Cir. 2020) ................................................45

*Ray v. Roane*,
  948 F.3d 222 (4th Cir. 2020) ................................................31

*Regatos v. N. Fork Bank*,
  838 N.E.2d 629 (N.Y. 2005) .................................................27

*Sedar v. Reston Town Ctr. Prop., LLC*,
  988 F.3d 756 (4th Cir. 2021) ................................................51

*Tolan v. Cotton*,
  572 U.S. 650 (2014) .......................................................... 52, 53

*W.C. English, Inc. v. Rummel, Klepper & Kahl, LLP*,
  934 F.3d 398 (4th Cir. 2019) ................................................31

## Statutes

28 U.S.C. §1291 ........................................................................1

28 U.S.C. §1331 ........................................................................1

28 U.S.C. §1367 ........................................................................1

U.C.C. §4A-102 cmt. ..........................................................................................5, 6

U.C.C. §4A-103(a)(1) ............................................................................................33

U.C.C. §4A-103(a)(3) ............................................................................................33

U.C.C. §4A-103(a)(4) ............................................................................................33

U.C.C. §4A-103(c) ................................................................................................33

U.C.C. §4A-104 cmt. 3 ....................................................................................... 8, 44

U.C.C. §4A-104(a) ................................................................................................33

U.C.C. §4A-104(c) ................................................................................................33

U.C.C. §4A-104(d) ................................................................................................33

U.C.C. §4A-202 ....................................................................................................35

U.C.C. §4A-203 ....................................................................................................35

U.C.C. §4A-203 cmt. 1 ..........................................................................................35

U.C.C. §4A-204 ................................................................................................ 6, 34

U.C.C. §4A-204 cmt. 1 ...................................................................................... 6, 34

U.C.C. §4A-204(a) .......................................................................................... *passim*

U.C.C. §4A-205(a)(3) ............................................................................................38

U.C.C. §4A-209(a) ................................................................................................33

U.C.C. §4A-209(b) ................................................................................................33

U.C.C. §4A-211 ....................................................................................................43

U.C.C. §4A-211 cmt. 1 .................................................................................... 37, 42

U.C.C. §4A-211 cmt. 3 ..........................................................................................43

U.C.C. §4A-211 cmt. 4 ...................................................................................... 7, 43

U.C.C. §4A-211 cmt. 5 ..........................................................................................43

U.C.C. §4A-211(c) ................................................................................................43

U.C.C. §4A-211(c)(2) ........................................................................................ 7, 42

U.C.C. §4A-211(e) ................................................................................................42

U.C.C. §4A-301 ....................................................................................................33

U.C.C. §4A-404 cmt. 3 ...................................................................................... 42, 43

U.C.C. §4A-404(a) .......................................................................................... *passim*

U.C.C. §4A-404(c).................................................................................7

U.C.C. §4A-501 .................................................................................43

**Regulations**

12 C.F.R. §210.25(b)(1)........................................................................6

Funds Transfers Through Fedwire,
    55 Fed. Reg. 40,791 (Oct. 5, 1990)............................................. 6, 26

**Rules**

Fed. R. Civ. P. 12(b)(6)..................................................... 31, 39

Fed. R. Civ. P. 56(a)...............................................................53

Fed. R. Civ. P. 56(c)(1)(A)......................................................53

Fed. R. Civ. P. 56(c)(4)...........................................................53

Fed. R. Evid. 201(b)(2)............................................................24

**Other Authorities**

*About Us*, Western Union, https://corporate.westernunion.com/ (last visited
    Dec. 22, 2021)......................................................................4

Amendment No. 3 to Equipment Master Supply Purchase Order Agreement,
    https://files.covid19.ca.gov/pdf/BYD-Motors-LLC-OES-3.pdf (last visited
    Dec. 22, 2021).....................................................................25

Bd. of Governors of the Fed. Rsrv., *Fedwire Funds Transfer System:
Assessment of Compliance with the Core Principles for Systemically
Important Payment Systems*, https://www.federalreserve.gov/
paymentsystems/fedfunds_coreprinciples.htm (revised July 2014).....................5

BYD Equipment Master Supply Purchase Order Agreement,
    https://files.covid19.ca.gov/pdf/BYD-Motors-LLC-OES.pdf (last visited
    Dec. 22, 2021)............................................................. 24, 25

Jennifer Cohen & Yana van der Meulen Rodgers, *Contributing Factors to
Personal Protective Equipment Shortages During the COVID-19
Pandemic*, Preventative Medicine, vol. 141, Dec. 2020,
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7531934/ .................................8

Carlyle C. Ring, Jr., *The UCC Process—Consensus and Balance*, 28 Loy.
    L.A. L. Rev. 287 (1994)........................................................6

Second Equipment Master Supply Purchase Order Agreement,
https://files.covid19.ca.gov/pdf/BYD-Motors-LLC-OES-5.pdf (last visited
Dec. 22, 2021) ..................................................................................................... 25

Matthew W. Swinehart, *Modeling Payments Regulation and Financial
Change*, 67 U. Kan. L. Rev. 83 (2018) .................................................................. 5

# JURISDICTION

The district court had jurisdiction over Blue Flame's federal banking-regulation claims under 28 U.S.C. §1331, and supplemental jurisdiction over its state-law claims under 28 U.S.C. §1367. This Court has appellate jurisdiction under 28 U.S.C. §1291. The district court entered judgment on September 23, 2021, and notice of appeal was timely filed on October 21, 2021. JA3099; JA3101-02.

# STATEMENT OF ISSUES

1. Whether U.C.C. §4A-204(a) requires repayment when a bank accepts a payment order falsely issued in its customer's name if the bank itself (rather than a third party) issued that unauthorized payment order.

2. Whether U.C.C. §4A-204(a) preempts state-law claims respecting a bank's knowingly false issuance of a payment order in its customer's name.

3. Whether, after concluding that Chain Bridge violated U.C.C. §4A-404(a), the district court erred in entering summary judgment in Chain Bridge's favor for lack of damages.

4. Whether the district court erred in granting summary judgment to defendants on Blue Flame's tortious-interference claims.

**INTRODUCTION**

This case is about a bank that broke federal law. It's also about a district court that apparently considered the affected customer so distasteful, so undeserving of a legal remedy, that it went out of bounds to deprive it of one.

Plaintiff-Appellant Blue Flame Medical LLC was created in March 2020 by two former political consultants who saw the new and urgent need for personal protective equipment (PPE) as a lucrative opportunity. Hoping to create a multibillion-dollar company, they leveraged their business contacts to find suppliers that could deliver millions of N95 masks, even in the midst of a global scrum for PPE. Soon, relying on their contacts and government experience, they had entered into a $600 million contract with the State of California, which had an urgent need for the masks Blue Flame could supply.

To that point, the deal was American capitalism in its rawest form: not necessarily pretty, but efficient, responsive to the forces of supply and demand, and built in reliance on the legal and regulatory foundation that structures modern commerce. But everything collapsed when the bank Blue Flame trusted with its account, Chain Bridge Bank, N.A. (CBB), placed its own interests above its customer's. Concerned about the deposit's impact on its capital ratios, CBB withheld the funds from Blue Flame when they arrived, and then forged a wire transfer in Blue Flame's name to send the funds away.

Unsurprisingly, federal regulations prohibit what CBB did here—or, if they're construed not to, state law surely does. But Blue Flame's suit foundered in the district court. Through a combination of internally incompatible rulings, atextualism, and improper weighing of evidence on summary judgment, the court below nixed all of Blue Flame's claims, leaving it without a remedy in the face of CBB's clear misconduct.

Blue Flame does not claim to be pure of heart, or even particularly likeable. But this is a court of law, not of public opinion, and all parties—even the unpopular ones—are entitled to the law's protection. Perhaps more to the point, the American economy depends on the finality and the inflexible allocation of risk that undergird the federal wire-transfer system. Were the district court's view of permissible bank behavior to prevail, the effect could be catastrophic. It's incumbent on this Court to make clear that banks are not free to go off-book and do whatever they please with customers' funds.

The Court should direct entry of judgment for Blue Flame on its U.C.C. §4A-204(a) claim, reverse the district court's entry of judgment against Blue Flame on its state-law and U.C.C. §4A-404(a) claims, and remand.

# STATEMENT OF CASE

## I.    Legal Background

One big advantage of cash transactions is that the recipient knows immediately that they have the money and can use it right away.  That is to say that such transactions are immediately verifiable and impossible for the payor to unilaterally revoke based on subsequent disputes or second thoughts.  Likewise, there is no risk to either party or any intermediary that the funds will not arrive.  Payees in large and important transactions are thus likely to insist on using cash or other payment methods that approximate it.  That's why buying a home requires something like a cashier's check, not a personal check or credit card.

Of course, cash has its limits, too.  In addition to the hassle of counting bills or weighing bullion, cash can be stolen or counterfeited.  And much more importantly for present purposes, such physical transactions simply cannot harness the speed of modern telecommunications.

This is where the "wire transfer"—or what banking law now calls the "funds transfer"—comes in.  In 1871, Western Union used its telegraph network to launch a service where a sender could pay money to one telegraph office, which would then "wire" a message to another office to pay an intended beneficiary.  *See About Us*, Western Union, https://corporate.westernunion.com/ (last visited Dec. 22, 2021).  Then, in 1918, the U.S. Federal Reserve Banks developed the Fedwire Funds Service

so that "interbank payment obligations" could be settled without "the physical delivery of cash or gold …, which was both risky and costly." Bd. of Governors of the Fed. Rsrv., *Fedwire Funds Transfer System: Assessment of Compliance with the Core Principles for Systemically Important Payment Systems*, https://www.federalreserve.gov/paymentsystems/fedfunds_coreprinciples.htm (revised July 2014) (*Fedwire*). Today, Fedwire is routinely used for "time-critical payments such as the settlement of commercial payments and financial market transactions" between banks and bank customers, *id.*, largely because it "settles each transaction on a real-time basis," Matthew W. Swinehart, *Modeling Payments Regulation and Financial Change*, 67 U. Kan. L. Rev. 83, 124 (2018). The Fedwire system "provides substantial commercial benefits to Fedwire participants, especially those engaged in large commercial transactions, because"—as with cash—"the receipt of funds is irrevocable and verifiable in near real-time." *Id.*; *see also Fedwire* ("Payment to the receiving participant over the Fedwire Funds Service is *final* and *irrevocable* when the amount of the payment order is credited to the receiving participant's account[.]") (emphasis added).

Despite Fedwire's benefits, major economic actors still lacked the certainty that inhered in cash transactions because, for a long time, only state law governed what happened if a wire transfer went wrong. *See* U.C.C. §4A-102 cmt. The solution was Article 4A of the Uniform Commercial Code, which the Federal Reserve

Board incorporated into Regulation J, governing funds transfers, in the early 1990s. Funds Transfers Through Fedwire, 55 Fed. Reg. 40,791 (Oct. 5, 1990); 12 C.F.R. §210.25(b)(1).

The drafters of Article 4A engaged in a "careful and delicate balancing" between the "competing interests … of the banks that provide funds transfer services and the commercial and financial organizations that use the[m]." U.C.C. §4A-102 cmt. In balancing those interests, they made "a deliberate decision … to use precise and detailed rules to assign responsibility, define behavioral norms, [and] allocate risks …, rather than to rely on broadly stated, flexible principles." *Id.* That way, all parties could "predict risk with certainty" and adopt appropriate "operational and security procedures." *Id.*; *see also* Carlyle C. Ring, Jr., *The UCC Process—Consensus and Balance*, 28 Loy. L.A. L. Rev. 287, 292-93 (1994). Article 4A was thus given sharp and unyielding teeth in provisions that clearly assign the risk of loss in various circumstances—including when banks make transfers that do not follow Article 4A's "precise and detailed rules" for determining whether a wire is authorized. *See* U.C.C. §4A-204 & cmt. 1 (explaining circumstances where "the bank takes the risk of loss with respect to an unauthorized payment order"). Indeed, these provisions were "crafted with the express purpose of creating—in an age of increasing automation—*inflexible* rules of liability for wire transfer disputes." *First Sec. Bank*

*of N.M., N.A. v. Pan Am. Bank*, 215 F.3d 1147, 1152 (10th Cir. 2000) (emphasis added).

For the same reasons, Article 4A's drafters considered "[e]stablishing finality in electronic fund wire transactions" to be "a singularly important policy goal." *Banque Worms v. BankAmerica Int'l*, 570 N.E.2d 189, 195 (N.Y. 1991). The rules thus firmly require that, once a transferee's bank has accepted a wire, it must give the funds to the intended recipient—as though the beneficiary had received a direct cash transfer from the sender. *See* U.C.C. §4A-404(a). Article 4A even specifies that this requirement cannot be altered by agreement, *id.* §4A-404(c), while making it virtually impossible to cancel a wire once the transferee's bank has accepted it, *see id.* §4A-211(c)(2). Indeed, because the cash belongs to the transferee as soon as it arrives, such an order cannot be cancelled even with the consent of that beneficiary's bank "except in unusual cases" involving either the consent of all affected parties or very specific technical mistakes. *See id.* & cmt. 4 ("Since acceptance [by the beneficiary's bank] affects the rights of the originator and the beneficiary it is not appropriate to allow the beneficiary's bank to agree to cancellation or amendment, except in unusual cases.").

The result of these detailed rules is that "[t]he function of banks in a funds transfer under Article 4A is … essentially mechanical in nature." U.C.C. §4A-104

cmt. 3. It is thus clear both what banks need to do to avoid creating liabilities in funds transfers and what liability they face if they violate their role in the machine.

## II.    Factual Background

### A.    Blue Flame's Creation and California Contract

When COVID-19 began to spread rapidly across the country in early 2020, supplies of PPE lagged well behind need, leaving healthcare workers and others vulnerable.[1]   Believing they could help governmental clients navigate the worldwide scramble for PPE—and sensing a tremendous business opportunity—John Thomas and Michael Gula set aside their work as political consultants and fundraisers to form Blue Flame Strategies in February 2020.  *See* JA1520-21.  They hoped their international and governmental connections would help them find suppliers and win government contracts, allowing them to capitalize on the moment to create a "multibillion dollar company."  *See* JA1520-23.  In so doing, they took a big risk, leaving behind stable work in lucrative careers to pursue their entrepreneurial goal.  *See* JA525-28.

Thomas and Gula incorporated Blue Flame Medical LLC (Blue Flame) in Delaware on March 23, 2020.  JA139; JA3067.  They had every reason to think they

---

[1] Jennifer Cohen & Yana van der Meulen Rodgers, *Contributing Factors to Personal Protective Equipment Shortages During the COVID-19 Pandemic*, Preventative Medicine, vol. 141, Dec. 2020, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7531934/.

were about to play a critical—and profitable—role in addressing the early months of the pandemic.

Indeed, by mid-March 2020—even prior to the business's formal incorporation—Blue Flame's principals had landed an enormous opportunity. On March 20, Thomas was already discussing a deal with the State of California to deliver N95 masks and other PPE. *See* JA139; JA1571-72. And only two days later, Thomas had made direct contact with Michael Wong, California's Contracts Administrator, to negotiate a deal to benefit both Blue Flame and California. JA1587.

Over the next several days, via text and email, Wong and Thomas discussed California's PPE needs and Blue Flame's ability to deliver N95 masks. They quickly reached an understanding. JA1587-95; JA1605-75. Given the competition for suppliers, Thomas made clear that California would have to prepay so Blue Flame could secure product. JA1587; JA1669-70. In turn, Wong told Thomas he wanted Blue Flame to "shoot for 100M" masks. JA1591.

In an email exchange on March 24, Thomas summarized the parties' understanding, stating that two million N95 masks could be delivered "on day 7," six million could ship immediately, and another 50 to 55 million could be delivered "within 30 days." JA1686-87. Thomas indicated that Blue Flame could secure the other 37 million masks but needed to communicate with suppliers before it could "quote exact capacities." JA1687. Nothing about this understanding is surprising: Given the

nascent worldwide lockdowns and mad scramble for PPE, Blue Flame fully believed it could deliver the 100 million masks California wanted to "shoot for," but also emphasized to California that it needed the funds immediately to secure them, that different tranches would arrive at different times, and that it was still sorting out suppliers' capacities. Accordingly, Blue Flame told California no fewer than four times that it would be able to inspect the product and reject it for a full refund if it was not satisfied. JA1755; JA1668; JA1608; JA1587.

California was eager to move forward on those terms. After confirming the mask models California wanted and asking about pricing, Wong said on March 24 that California wanted to "execute on this today," JA1684, and asked Thomas to send him an invoice for 100 million N95 masks, JA1683. Thomas sent that invoice on March 25, and Wong said California would pay Blue Flame via wire transfer "first thing in the morning." JA1716-17. The parties agree that, on that date, California's Department of General Services (DGS) formally agreed to purchase 100 million N95 masks for a total of $609,161,000, including tax and shipping, and to prepay 75% of the total amount. JA139. That night, Thomas sent Wong and Daniel Kim, DGS Director, a "list of rough delivery timelines and manufacturers," indicating that deliveries would take place through most of April. JA1753-54; JA3069. Both parties understood that the contract's goal was to deliver masks as soon as possible. JA1602; JA1558.

## B. Blue Flame's Supply Arrangements

Even before securing California's commitment, Blue Flame—recognizing that demand was rising and supply was uncertain—launched itself into the global scramble for available PPE. *See, e.g.*, JA1720-50 (March and April 2020 texts between Blue Flame and the CEO of supplier Great Health Companion (GHC)). Those efforts bore fruit: On March 25, Blue Flame executed an agreement with PPE supplier Suuchi to purchase six million masks—which were available to ship immediately—for $22,680,000. JA1557; JA1767-68. The Suuchi purchase agreement incorporated the terms of an executed Product Reseller Agreement providing that time was of the essence. JA1767; JA1787.

Blue Flame and GHC executed a substantively identical agreement that same day. JA1773-84; *see* JA1774. And the day after, GHC sent Blue Flame an order confirmation pledging to provide 20 million masks, "shipped in tranches as often and as soon as available," by no later than 40 days after receipt of payment. JA1770-71. GHC's order confirmation further provided that, for the subsequent two months, GHC would ship masks to Blue Flame at the estimated rate of 40 million/month, also "in tranches as often and as soon as available." JA1771. CEO Henry Huang contemporaneously told Blue Flame that GHC could supply at least 30 million masks in the first month. *See* JA1733; JA1737.

Given the state of the world, the timing was certainly going to be tight.  But with California committing to prepay the majority of such a sizeable order and its suppliers committing to deliver 100 million N95 masks of the specified models, Blue Flame was confident it could deliver.  This confidence was well placed:  According to Marc S. Prisament, an expert with over 35 years of hands-on experience in the medical, manufacturing, and service sectors, JA2784, there was no reason Blue Flame would have been unable to fulfill its commitment to California, *see* JA2811; *see also* JA2788-95 (examining China's manufacturing infrastructure and explaining "that Blue Flame's supply chain had the capacity to fulfill California's order"); JA2795-97 (explaining why China's export restrictions would not have prevented Blue Flame from obtaining masks for California); JA2794 (recognizing that, "[w]hile a 30-60 day delivery timeframe might have been tight, it was certainly possible").

Even if Blue Flame ended up falling short of this overarching goal, however, it was clear enough from Wong's instruction to "shoot for 100M" masks what was going to happen:  California was going to prepay 75% of a large invoice; Blue Flame was going to try to secure every mask it could with that money; California was committing to buy *at least* 100 million masks; and the State could expect a refund as to any masks that didn't materialize or meet its requirements.

## C. Blue Flame Picks CBB as Its Bank for the Express Purpose of Handling This Transaction.

The resulting transaction was exactly what the wire-transfer system contemplates. So on the morning of March 25—while Thomas was negotiating California's invoice and prepayment—Gula visited CBB and applied to open a business checking account. JA139; JA1798-99. Blue Flame picked CBB because Gula had trusted it with his personal and business banking for a decade. JA1527-28. CBB opened the account later that day and provided Blue Flame wiring instructions and an account-verification letter. JA139.

Given the transaction's time-sensitivity and importance, Blue Flame did everything it could to prepare CBB to receive the funds on its behalf. Gula spoke to SVP and Branch Manager Heather Schoeppe, telling her that Blue Flame expected a wire transfer of roughly $450 million from California and needed notice "the second" the transfer "hits our accounts." JA3141 0:15-0:30; JA139-40; JA3070. Later that day, Gula explained to Schoeppe that the wire's purpose was to purchase 100 million masks for California and that Blue Flame would need to wire the money out quickly. JA3142 0:20-0:25, 0:50-1:03; JA3070-71. Gula indicated that roughly $300 million would be wired out, but that "not all of it's going out, obviously, because we have a profit." JA3142 0:58-1:00; *accord* JA1814-15. Schoeppe responded with congratulations. JA3142 1:33-1:37. Taking no chances, Gula also

informed CBB's Assistant VP Maria Cole of the wire's size, JA1826, and that Blue Flame "definitely" needed same-day access to the incoming funds, JA1806.

That afternoon, CBB's CEO John Brough and its president David Evinger called Gula. JA140. Gula told them, too, about Blue Flame's California contract, the incoming wire amount, and its need to move money out quickly to purchase the PPE. *See* JA1850-51; JA1881-83. Evinger and Brough assured Gula that CBB could handle the operational challenges posed by the wire's size, *see* JA1912; JA2337-38. In an internal conversation, Brough stated his understanding that Blue Flame was "going to make 100 million dollars off selling the masks." JA3143 9:30-9:33.

Knowing the wire would be executed on March 26, Thomas followed up with CBB that morning, reminding Cole that "a lot [was] at stake" and that he needed to know "the second that wire lands," because he had "a bunch of manufacturers held up" waiting for confirmation that Blue Flame had the requisite funds. JA3138 2:30-2:44. Thomas told Cole that "this is the initial wire that … empowers us to go fill the other orders." *Id.* 4:19-4:33.

There was no pushback whatsoever on these requirements. Indeed, at no point before CBB received the wire did *any* CBB employee tell Thomas or Gula that CBB had concerns about the transaction's legitimacy, or that Blue Flame would not be

able to make the immediate outgoing transfers to its suppliers that Gula had previewed for CBB's senior executives.  *See* JA1534-35.

### D.   CBB Fails to Fulfill Its Role in the Wire-Transfer System.

As expected, on the morning of March 26, JPMorgan Chase & Co. (JPMC), California's bank, sent CBB a wire transfer authorized by the California State Treasurer's Office (STO) for the benefit of Blue Flame.  JA140; JA3073.  All details on the wire transfer notice—including the Originator (California's DGS), Beneficiary (Blue Flame), and amount ($456,888,000)—matched the information Gula provided the day before.  JA2012; JA1876; JA1847.  The incoming wire was flagged by CBB's system and manually approved by Rick Claburn in CBB's Operations department. JA2014; JA2017-18.  At 11:58AM, Claburn emailed Cole, Schoeppe, and SVP Mike Richardson to notify them that "[t]he wire has been received and credited to the client's account."  JA2098; *accord* JA3073 ("[T]he incoming wire … was credited to Blue Flame's [a]ccount.").  That email was forwarded to both Evinger and Brough at 12:29PM.  JA2096-97.

Thanks to Fedwire, this transaction settled almost instantly.  At 11:57AM, Gula received an "Incoming Wire Confirmation" email containing a link to a secure message reflecting CBB's acceptance of the funds transfer.  JA2064-65; JA140; *see also supra* p.5 (noting that wires accepted by the beneficiary's bank are final and irrevocable).   Thomas called Cole and explained that Gula had received the

notification email but was having difficulty opening the secure message and needed to confirm the amount; Cole responded that she would check and call back. JA3139. At approximately 12:00PM, Gula successfully accessed Blue Flame's account through CBB's web portal and confirmed the funds were displayed. JA1544. Two minutes later, Cole called Thomas back to confirm the amount of the wire CBB had accepted. JA1560-62; *see* JA2069.

Cole and Thomas then discussed Blue Flame's need to quickly send outgoing wires to its suppliers. JA1555; JA1560-62. Cole confirmed that CBB could process those wires manually, and Thomas agreed to send her the wire instruction details. JA1560-62. At 12:10PM, Cole emailed Thomas a form for the outgoing wire transfers. JA2071-72. And at 12:12PM, Cole informed CBB's Operations staff that Blue Flame "will wire out today 2 wires totaling $22,680,000.00" and asked to confirm that the "[f]unds are available." JA2074.

Minutes later, at 12:14PM, Blue Flame's counsel emailed Cole at Thomas's request to provide instructions for wiring $22,680,000 to Suuchi, which had agreed to ship six million N95 masks immediately upon receipt of the funds. JA2085. Thomas himself then responded to confirm Blue Flame's authorization of the instructions and to request that the wire be prepared "asap[.]" JA2087.

That wire never went out, however—with disastrous consequences for Blue Flame's business with California and beyond. Though it had given Blue Flame no

hint of concern (and no opportunity to decide to bank elsewhere), CBB had apparently grown worried, starting the day before, about how these transactions would affect the bank.  On March 25, CFO Joanna Williamson had told Schoeppe she was worried because the wire "would have a really big impact on [CBB's] capital ratios," JA3144 2:26-2:30; JA3071—which were to be calculated as of March 31, JA1840.  Williamson thus floated the idea of using an Insured Cash Sweep (ICS) account to keep the funds off CBB's balance sheet.  JA3144 2:00-2:16.

That same day, CBB's president, Evinger, independently raised the same issue:  "[W]e can't hold that money on our balance sheets.  [Gula's] going to have to agree to have it go into a feeder's account or into an ICS account."  JA3143 3:09-3:18; JA3071.  Hearing Evinger's concern, CEO Brough echoed it while adding an (unrelated) note of worry about the transaction's legitimacy, saying: "[O]ur balance sheet is so flush with money that this is—and this is kind of a weird transaction." JA3143 4:02-4:10; JA3073.  Brough went on to say he didn't "like the smell of" the transaction and that the wire's "header data [was] going to be really important to see."  JA3143 9:00-9:03, 11:20-11:28 (expressing concern that "someone has penetrated the State coffers and is raiding [them]").

Unsurprisingly, the parties dispute whether these contemporaneous exchanges reveal a predominating concern about Blue Flame somehow defrauding California or about CBB's own balance sheet.  It's worth noting, however, that placing a "hold"

on Blue Flame's funds to investigate the former concern would not stop those funds from being "accounted for in the balance sheet the same," JA1842 (Williamson depo.)—leaving CBB with the same capital-ratio problem.

While CBB's motivations are disputed, what happened next is not. At 12:25PM—even though the wire transfer's "header data" conformed perfectly to the information Blue Flame provided, JA2012; JA1876; JA1847—CBB placed a "hold" on the funds, JA2107, per Evinger's direction, JA141. Then, four minutes later, SVP Richardson emailed Williamson, Brough, Evinger, Schoeppe, and Cole to note that Evinger's idea was not going to work because "the ICS program has a maximum limit of $125 mil[lion]." JA2096-97. Richardson thus highlighted the need for "clarity around how long these funds would be on deposit." *Id.*

Rather than seeking that clarity or notifying its customer about its concerns, however, CBB ghosted Blue Flame. Brough directed CBB employees: "Do not contact the client about this wire." JA2109. Accordingly, CBB employees did not answer Gula's call to the bank's main number, JA2096, and Cole—despite having spoken with Blue Flame when the wire landed—did not answer her cell phone when Gula called her back, JA2095. In both instances, Brough commended his employees for avoiding CBB's own customer. *Id.* ("Continue to hold him off."); *id.* ("That was the right thing to do.").

In the meantime, Evinger called three California state offices, including DGS, between 12:15PM and 12:21PM.  JA2121-23.  DGS's Chief Accounting Officer returned Evinger's call at 12:50PM and left a voicemail confirming the wire's legitimacy and exact amount.  JA3132; JA3075.  Nevertheless, CBB pursued the matter further, calling DGS back and asking to speak to someone in California's STO.  JA3134 0:42-0:47; JA3075.  At 1:19PM, STO officials returned CBB's call to confirm to Evinger and Brough that California had indeed originated the transfer, intended it for Blue Flame, and intended to purchase 100 million N95 masks.  JA1891-92; JA1930.  This is to say that CBB's president had *personally* confirmed the wire's legitimacy with two separate California offices, even though its header data was exactly as expected.  One might reasonably expect things to have ended there, if not well before.

But no.  Instead, while asking no further questions, Evinger and Brough took it upon themselves to tell STO officials about the newness of Blue Flame's account and that "the account holder was a lobbyist."  JA1977-78 (STO official confirming that "the conversation was not about whether the wire amount was right" or "whether it was actually credited to the right account"); *see* JA3075.  The whole conversation was highly unusual:  Natalie Gonzales, an STO official on the call, testified that she could not recall ever being contacted by another wire-transfer recipient's bank.  JA1972.

Things would only get more unusual from there.  At 12:30PM, a JPMC employee called CBB to express JPMC's own suspicions about the wire and see if CBB could still hold the funds.  JA2153-54; *see* JA3073-74.  Evinger responded by noting CBB's own suspicions about the wire and then falsely telling JPMC that the funds had been held by CBB *without* being credited to Blue Flame's account.  JA2001-05; JA2007-08.  CBB later made the same misrepresentation to STO officials.  JA1961; JA1980; JA3075.  Worse, defendants plainly knew this wasn't true; Evinger and Brough had received an email confirming that Blue Flame's account had already been credited, JA2096-98, and that credit was obviously reflected in CBB's own systems, *see supra* pp.15-16.

Nonetheless, Evinger seemed willing to go to extraordinary lengths to get this wire off CBB's books.  Accordingly, at 1:34PM, Evinger suggested to JPMC's Rakesh Korpal that JPMC take the money back by issuing a recall.  JA3135 0:05-0:09; *see* JA141; JA3076.  Korpal clearly understood the risks involved in trying to unwind a valid Fedwire funds transfer, responding:  "I don't think you and I want to get onto the front page of the *Wall Street Journal*, especially if this is a legitimate transaction."  *See* JA3135 0:20-0:28; JA3076.  But believing Evinger's representation that the funds had not been credited to Blue Flame's account, JA2003; JA2005, Korpal ultimately acceded to the "request from Chain Bridge Bank to recall the

funds," JA2006, and directed his subordinate to recall them, per CBB's request, *see* JA2159.

JPMC sent that recall request at 1:45PM. JA2197-98. The message was transmitted over Fedwire at 2:05PM. JA1065.

Even at that point, it was still not too late for CBB to steer back within the very clear guardrails of Article 4A and Regulation J by acknowledging that the original transfer could no longer be recalled without Blue Flame's consent. *See supra* p.7. In fact, in a conversation with the CBB employees who would eventually be tasked with returning the funds to JPMC, *see* JA2216-17, both Evinger and Brough were warned *again* by their own employees that "we credited the customer's account." JA3140 2:09-2:27 ("Normally, you want to get [an indemnity letter] from the other bank, just because—and in this case because we *credited* the customer's account."). Evinger's response was: "It's okay, don't worry about it. … It is what it is." *Id.* 2:27-2:33. Brough agreed, stating, "David [Evinger] and I have been working on this with both the state of California and JPMorgan, and this is what we have to do." *Id.* 2:35-2:48. So, at 1:54PM, Brough emailed a number of CBB employees: "We have received a recall notice from JPMorgan to return the wire. I will let Mike Gula know." JA2211.

The record unambiguously demonstrates what happened next—which is the most extraordinary fact of all. It is undisputed that Blue Flame did not initiate,

consent to, or authorize a transfer of these critical funds out of its account. So some-one else—presumably (and according to the district court) someone at CBB, JA3077; JA3089, but *certainly* not at Blue Flame—drew up the following payment order, in the name of Blue Flame as sender:

| | | | Beneficiary: | | |
|---|---|---|---|---|---|
| | | *Outgoing* | Account Number: | | 7871 |
| | | | Account Type: | | D |
| **Wire Details** | | | Name: | | |
| Wire Amount: | | $456,888,600.00 | CALIFORNIA STATE TREASURER | | |
| Business Function Code: | | CTR | Address 1: | | |
| Foreign Wire: | | N - No | CONCENTRATION ACCOUNT | | |
| | | | Address 2.....: | | |
| Wire Sequence Number: | | 33 | 915 CAPITOL MALL RM 319 | | |
| User Request Correlation: | | | SACRAMENTO CA 95814-4801 US | | |
| Wire Status: | | RW | Receiving Bank: | | |
| Wire Type: | | 10 | Bank Name: | | |
| Wire Subtype: | | 02 | JPMORGAN CHASE | | |
| Wire Source: | | FD | Bank Routing Number: | | 21000021 |
| Analysis: | | W - Waive fee | Address 1: | | |
| | | | Address 2: | | |
| Fee/Counter: | | | Address 3: | | |
| Print Notice: | | N - None | Address 4: | | |
| Last Changed By: | | | | | |
| V78CAM | | | Reference | | |
| Repetitive Code: | | | Sender Reference: | | 2693100086JO |
| | | | Beneficiary Reference: | | ATS OF 20/03/26 |
| **Originator:** | | | Originator to Beneficiary Information | | |
| Account Number: | | 7459 | BY ORDER OF DEPARTMENT OF GENERAL | | |
| Account Type: | | D | SERVICES | | |
| Name: | | | | | |
| BLUE FLAME MEDICAL LLC | | | | | |
| Address 1: | | | *Claudia Mojica* | | |
| US | | | | | |
| Address 2: | | | *Thais Ribeiro* | | |
| Address 3: | | | | | |

JA2216. Then, knowing beyond any doubt that it had not in fact been authorized by Blue Flame, *e.g.*, JA1541-42; JA1563-64, CBB accepted and executed this order,

processing it and debiting Blue Flame's account at 2:59PM, JA2216-17. A funds transfer of $456,888,600 "from" Blue Flame to the California State Treasurer was then completed over Fedwire at 3:21PM, JA2214; JA3077, taking the balance off CBB's balance sheet, repairing its capital ratios, and leaving Blue Flame without any funds for the suppliers it had lined up.

Below, defendants relied on hearsay to the effect that—*after* CBB had requested a recall from JPMC, JA3135 0:05-0:09, and *after* JPMC sent that request, JA2197-98 (and, of course, after Brough and Evinger had started calling California to sow doubt, *supra* p.19)—California officials contacted JPMC asking that the funds be recalled, JA916-17 (Korpal deposition, stating that another JPMC employee told him at some point that California had made such a request at 2:00PM); JA3077. But, notably, there is no evidence properly in the record indicating that California was involved in this recall request at all.

### E.  Subsequent Developments

1. The unauthorized return of Blue Flame's funds obviously scuttled not only the California contract, but much of Blue Flame's other business as well. Deprived of cash—and with its supplier relationships badly damaged, *e.g.*, JA2207; JA2529— Blue Flame inevitably struggled to secure product orders in the global scramble for PPE. For example, Tennessee ordered 500,000 N95 masks and 500,000 disposable gowns on April 6, 2020, and Blue Flame received the full deposit of $2,590,122 on

April 15.  JA1124.  But prices had moved significantly in the interim, and lacking both credibility with its suppliers and the cash that the California contract would have provided, Blue Flame was unable to secure PPE at the necessary price.  *See id.*  Blue Flame not only issued Tennessee a full refund, but also reimbursed it for the nearly $40,000 credit-card fee the State incurred in processing the transaction.  *Id.*

Nevertheless, Blue Flame did complete numerous PPE orders, including contracts with Maryland for 1.55 million N95 masks and with Chicago for 100,000 N95 masks.  JA2726; JA2759.

2.  The core factual dispute below surrounded whether Blue Flame could have secured 100 million masks in 30 days, and what California might have done if it didn't—a matter on which history does not reveal her alternatives.  But it *is* a matter of public record that California was anything but strict in demanding on-time performance from the N95 supplier it turned to thereafter.

On April 7, 2020, California contracted to purchase $990 million worth of N95 masks, prepaying $495 million to a firm whose previous business was making batteries.  *See* BYD Equipment Master Supply Purchase Order Agreement 21-22, 30, https://files.covid19.ca.gov/pdf/BYD-Motors-LLC-OES.pdf (last visited Dec. 22, 2021).[2]  Because BYD lacked NIOSH certification to produce N95s, the contract

---

[2] California's contracts are properly subject to judicial notice.  Fed. R. Evid. 201(b)(2).

made the purchase contingent upon BYD obtaining certification by April 30, 2020. *Id.* at 1-2. BYD apparently failed to do so, but instead of canceling the contract, California simply asked for a refund of half its prepayment and extended the certification deadline by 32 days. *Id.* at 38. BYD then failed to obtain certification *again*, to which California responded by again extending the deadline. Amendment No. 3 to Equipment Master Supply Purchase Order Agreement 1, https://files.covid19.ca.gov/pdf/BYD-Motors-LLC-OES-3.pdf (last visited Dec. 22, 2021).

These two extensions meant that BYD sent California no N95s until at least June 2020. And, indeed, the second contract extension contemplated deliveries in July. *Id.* at 3. But that apparently satisfied California, because it not only paid for this performance, but also executed another contract with BYD in late July 2020—without even specifying delivery timelines beforehand. Second Equipment Master Supply Purchase Order Agreement 20-21, 28, https://files.covid19.ca.gov/pdf/BYD-Motors-LLC-OES-5.pdf (last visited Dec. 22, 2021).

### III. Proceedings Below

Blue Flame filed a complaint against CBB, Evinger, and Brough in the Eastern District of Virginia in June 2020, asserting two violations of Article 4A (U.C.C. §§4A-204(a) and 4A-404(a)) against CBB, and state-law claims against all defendants. JA19-53. Section 204(a) provides, as relevant here, that if a bank "accepts a

payment order issued in the name of its customer as sender" without following certain verification procedures, and so sends out an unauthorized wire, it must refund the wired amount to its customer. *See* §4A-204(a). And §4A-404(a) provides that if a beneficiary's bank accepts a wire transfer, it must quickly make the wired funds available to that beneficiary, and is liable—including for consequential damages—if it does not. Accordingly, Blue Flame's core allegations were that CBB violated its common-law and regulatory duties by both knowingly wiring money out of its account without authorization and failing to give it access to the wired funds after accepting a valid wire transfer naming its customer Blue Flame as beneficiary. *E.g.*, JA20-52 ¶¶4, 94-96, 104-12, 123, 171-73.

The district court eliminated several state-law claims on defendants' motion to dismiss, finding them "definitely preempted" by Article 4A. JA61. It did not explain its reasoning, *see id.*, but presumably believed Blue Flame's state-law claims were "premised on conduct … covered by" Article 4A under this Court's decision in *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220 (4th Cir. 2002). *See id.* at 223 (holding that "[s]tate law claims premised on conduct not covered by Subpart B" are not preempted because they "cannot create a conflict with or duplicate the rules established in Subpart B").[3]

---

[3] "Subpart B" refers to Subpart B of Regulation J, which incorporates Article 4A into the federal regulatory scheme. 55 Fed. Reg. 40,791.

On subsequent cross-motions for summary judgment, however, the district court seemed to adopt the opposite view, and held that §4A-204(a) did not reach CBB's knowingly unauthorized transfer out of Blue Flame's account after all. JA3088-89.  The court's opinion affirmatively held that the funds *had* been credited into Blue Flame's account.  JA3081.  But its view was, essentially, that §4A-204(a) covers only third-party fraud by someone "pretending to be the bank's customer," JA3089, and not a bank knowingly wiring money out of a customer's account after drawing up the fraudulent payment order itself.  As support, the court string-cited three out-of-circuit cases that found §4A-204(a) applicable to third-party frauds, *see* JA3089 (citing *Gold v. Merrill Lynch & Co.*, 2009 WL 2132698, at *1 (D. Ariz. July 14, 2009); *Regatos v. N. Fork Bank*, 838 N.E.2d 629, 630-31 (N.Y. 2005); and *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 86-87 (2d Cir. 2010)), but cited no case limiting it to that context.  And while the district court stated that the unauthorized payment order here "was 'issued' by Chain Bridge, not 'accepted' by Chain Bridge" for purposes of §4A-204(a), JA3089, it did not explain who else could possibly have "accepted" the payment order CBB executed by sending money out of Blue Flame's account.

As to the §4A-404(a) claim, the court's order was mixed, but ultimately against Blue Flame.  It first concluded that CBB *had* violated §4A-404(a) by failing to give Blue Flame access to the funds after accepting the transfer from JPMC and

crediting Blue Flame's account. JA3080-83. And in so holding, it rightly rejected (as a matter of law) defendants' argument that the transfer had been validly cancelled—correctly citing Article 4A's "strict scope" for "cancellation." JA3082-83.

Nevertheless, the district court granted summary judgment for CBB by holding that Blue Flame "[could ]not *establish* that it sustained any damage" from the violation. JA3083 (emphasis added). As that language suggests, the court's opinion mostly weighs the evidence and adjudicates what that evidence "establish[ed]" rather than identifying the absence of any material factual dispute. *See* JA3083-88. In so doing, the court accepted defendants' predicative story (and rejected plaintiff's) about what would have happened if CBB had made the money available to Blue Flame as required, and found insufficient evidence that Blue Flame could have fulfilled California's entire order of 100 million masks. JA3088. It did not consider, however, whether Blue Flame could have partially fulfilled the order and thus suffered *some* damage sufficient to sustain a claim based on the liability it already found.

Blue Flame timely appealed. JA3101-02.

## SUMMARY OF ARGUMENT

Blue Flame's argument proceeds in three parts. Part I concerns U.C.C. §4A-204(a), as well as Blue Flame's state-law claims; Part II addresses U.C.C. §4A-404(a); and Part III addresses tortious interference.

I. Federal regulations governing funds transfers unambiguously provide that, unless they follow certain verification procedures not at issue here, banks are liable for processing payment orders their customers did not in fact authorize. U.C.C. §4A-204(a). Without addressing the plain text of the relevant provision, however, the district court gave two explanations for refusing to apply it, neither of them sound. First, relying on out-of-circuit cases that applied §4A-204(a) to third-party frauds, the district court effectively held that §4A-204(a) *only* applies to third-party frauds, and imposes no liability for accepting an unauthorized payment order the bank forged itself. Second, the district held that §4A-204(a) does not apply to a "reversal of funds," despite having earlier held that *no such thing happened here*. The undisputed facts and §4A-204(a)'s plain text mandate judgment for Blue Flame on this claim. *Infra* pp.31-38.

While the regulations dictate how banks *process* payment orders, however, they don't reach the *issuance* of false orders. The district court was thus incorrect to find Blue Flame's state-law claims preempted insofar as they were directed at CBB's falsification of a payment order, and Blue Flame should be permitted to re-plead those claims on remand. At the very least, should this Court find that §4A-204(a) does not apply to what CBB did here, it should revive the "preempted" state-law claims to avoid holding that no law prohibits a bank from wiring a customer's funds to whomever it chooses. *Infra* pp.38-40.

II. As to U.C.C. §4A-404(a), the district court correctly found CBB liable for failing to make Blue Flame's funds available as required after it accepted California's wire transfer. Nevertheless, the district court entered summary judgment against Blue Flame, finding it past debate that Blue Flame suffered no damages *whatsoever* from the violation.

That holding rested on twin predictive conclusions: (1) that California would have axed the deal anyway, regardless of CBB's violation; and (2) that Blue Flame couldn't have delivered even one mask. But the first forecast is untethered from reality—California was unfailingly accommodating in its subsequent PPE contract—and the second is contradicted by record evidence the district court discredited and ignored. Most jarringly, the district court utterly failed to take account of the clearest form of consequential damages: the funds themselves, which CBB even now continues to withhold from Blue Flame. This claim should be remanded for trial, so that the conflicting evidence can be weighed by a jury. *Infra* pp.40-55.

III. Finally, the district court similarly strayed beyond the bounds of summary judgment in rejecting Blue Flame's tortious interference claims, ignoring even the parties' *agreed* facts. These claims should thus be reinstated as well. *Infra* pp.55-56.

## ARGUMENT

This Court reviews dismissal under Fed. R. Civ. P. 12(b)(6) *de novo*, accepting the complaint's allegations as true and drawing all reasonable inferences in plaintiff's favor. *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020).

This Court also "review[s] summary judgments *de novo*, 'applying the same legal standards as the district court and viewing all facts in the light most favorable to the nonmoving party.'" *W.C. English, Inc. v. Rummel, Klepper & Kahl, LLP*, 934 F.3d 398, 402-03 (4th Cir. 2019) (citation omitted). Summary judgment is inappropriate where the nonmovant has offered "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A court considering a summary-judgment motion must believe the nonmovant's evidence and draw all justifiable inferences in its favor. *Id.* at 255. The Supreme Court has particularly earmarked "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" as "jury functions, not those of a judge." *Id.*

## I.   CBB Is Liable For Knowingly Wiring Funds Out Of Blue Flame's Account Without Authorization.

The district court's holding that CBB's conduct did not violate §4A-204(a) is not just wrong, but obviously so. That provision's whole purpose is to place the risk of an unauthorized funds transfer on any bank that fails to follow certain verification procedures—for any reason, no matter how innocent or unintentional. The plain text

thus clearly reaches the (much worse) circumstance where a bank *knows* it is accepting an unauthorized payment order because (as even the district court recognized) the bank "issued" the fraudulent payment order *itself*. JA3089. The court's error in holding otherwise is grossly exacerbated, however, by its simultaneous holding that state-law claims about such conduct are preempted. If neither §4A-204(a) nor common-law claims can reach CBB's unambiguously wrongful conduct here, banks are free to wire their customers' money to whomever they want, without consequence. That is not and cannot be the law.

### A.    The District Court Misinterpreted §4A-204(a).

As noted above, the district court held that §4A-204(a) did not reach CBB's conduct because it "actually covers payment orders that a bank accepts from a third party pretending to be the bank's customer," and so cannot reach a situation where the plainly unauthorized payment order "was 'issued' by Chain Bridge, not 'accepted' by Chain Bridge." JA3089. This reasoning is wrong several times over.

1. Begin with the plain text—something the district court surprisingly failed to discuss. Section 204(a) provides:

> (a) If a <u>receiving bank</u> <u>accepts</u> a <u>payment order</u> <u>issued</u> in the name of its customer as <u>sender</u> which is (i) not authorized and not effective as the order of the customer under section 4A-202, or (ii) not enforceable, in whole or in part, against the customer under section 4A-203, the bank shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to enforce payment and shall pay interest on the refundable amount calculated from the date the bank received payment to the date of the refund.

U.C.C. §4A-204(a) (emphases added).

Although Article 4A uses some counterintuitive terms, the purpose and effect of this section is very clear. A "receiving bank" is a bank that receives a *payment order* (not the funds), *see* U.C.C. §4A-103(a)(1), (3)-(4), and it "accepts" that payment order when it sends out funds in response, *see id.* §4A-209(a) (a receiving bank "accepts a payment order when it executes the order").[4] The first receiving bank is also called the "originator's bank," *id.* §4A-104(d), just as the person sending the money is called the "sender" or "originator," *id.* §4A-104(c), and the "payment order" is the instruction to make a funds transfer from that originator to the ultimate beneficiary, *id.* §§4A-103(a)(1), 4A-104(a). A payment order is "issued" when it is sent to the receiving bank. *Id.* §4A-103(c). So when you submit a wire-transfer form to your bank, you are "issuing" or "originating" the payment order "in the name of [the bank's] customer as sender," and your bank "accepts" that order by carrying out its instructions. Section 204(a) thus very simply provides that if that form was

---

[4] Technically, a receiving bank "executes" a payment order by sending out its own payment order to the beneficiary's bank. It then sends out the funds that bank pays to the beneficiary in turn and takes payment from the sender (usually by debiting her account). *See* U.C.C. §4A-301; *supra* p.6. This technical distinction explains why a beneficiary's bank can accept a payment order but cannot execute one, U.C.C. §4A-301, and why Article 4A thus provides that a beneficiary's bank "accepts a payment order" when it pays the beneficiary, *id.* §4A-209(b). These technicalities help the language deal with complex transactions where there are additional "receiving banks" between the originating bank and the beneficiary's bank, but they're unimportant in a case like this one, where only those two banks are involved.

not authorized by you, or enforceable against you because the bank followed certain verification procedures, your bank is on the hook for any funds it wired out of your account, plus interest.

That provision covers this case as clearly as possible. The payment order that resulted in the transfer out of Blue Flame's account was "issued in the name of [CBB's] customer as sender," *see supra* p.22, and CBB accepted it by executing the transfer it called for. And no one suggests that order was authorized by or enforceable against Blue Flame. CBB must thus "refund" Blue Flame's account and "pay interest." It is as simple as that.

Were confirmation needed, however, it is readily found in the U.C.C.'s official commentary, which explains that the real question is whether CBB was entitled to the payment it unilaterally took out of CBB's account—which it obviously was not. The commentary states that, "in each of the[] cases" like this one, where an order is not enforceable against a customer under §4A-204:

> [T]he bank takes the risk of loss with respect to an unauthorized payment order because the bank is not entitled to payment from the customer with respect to the order. The bank normally debits the customer's account or otherwise receives payment from the customer shortly after acceptance of the payment order. Subsection (a) of Section 4A-204 states that the bank must recredit the account or refund payment to the extent the bank is not entitled to enforce payment.

U.C.C. §4A-204 cmt. 1. This is, happily, a very precise description of exactly what happened here and what §4A-204(a) requires in response. Given that CBB

concededly knew the only payment order in the record was unauthorized, CBB has not and cannot identify any basis on which it would be entitled to payment from Blue Flame for the wire it sent. And so "Section 4A-204 states that [CBB] must recredit the account." *Id.*

This conclusion is further underscored by the commentary to §§4A-202 and 203, which detail what it means for a payment order to be authorized by or enforceable against a sender. It says:

> [A]cceptance of [a payment] order by the receiving bank is *based on a belief by the bank that the order was authorized by the person identified as the sender.* … [T]he receiving bank may suffer a loss unless it is entitled to enforce payment of the payment order that it accepted. … Given the large amount of the typical payment order, a prudent receiving bank will be unwilling to accept a payment order unless it has assurance that the order is what it purports to be.

U.C.C. §4A-203 cmt. 1 (emphasis added). Here, having issued the unauthorized order itself, CBB cannot have "belie[ved] … that the order was authorized by the person identified as the sender"—*i.e.*, Blue Flame. A "prudent receiving bank" in CBB's shoes would thus have done the exact opposite of what CBB did, to avoid "suffer[ing] a loss." And so CBB must put the money back with interest under §4A-204(a)'s plain command.

2. Without even discussing this plain text, the district court offered two reasons for its contrary conclusion. Neither makes any sense at all.

a. First, the district court purported to hold that, because the "payment order was 'issued' by Chain Bridge," it fell outside §4A-204(a), which "actually covers payment orders that a bank accepts from a third party pretending to be the bank's customer." JA3089. Section 204(a) does not even mention "third party" misconduct or frauds, however, much less *limit* its rule to such cases. Indeed, there is no support whatsoever—in text, commentary, or case law—for the proposition the district court actually needed to defend its holding here, which is that §4A-204(a) covers *only* third-party frauds on receiving banks.

It is therefore unsurprising that the district court not only failed to discuss the governing text, but also marshalled nothing more for its argument than three out-of-circuit cases standing for the (obvious) proposition that §4A-204(a)'s rule is broad enough to cover third-party frauds. *See supra* p.27. None remotely supports the conclusion that §4A-204(a) cannot cover anything else—let alone that it excludes the *worse* circumstance where the false payment order was issued by the customer's own bank.

b. Second, while its reasoning is unclear, the district court appeared to believe that the payment order was "not 'accepted' by Chain Bridge" here, either because it was "'issued' by Chain Bridge" or because the "payment order generated by Chain Bridge without Blue Flame's authorization" was used to accomplish a "reversal of funds." JA3089. Neither theory is logically coherent. The payment order was

36

clearly accepted here because the funds left Blue Flame's account and were sent to JPMC per that order's instructions, *see supra* p.22, and the court didn't even suggest who besides CBB could have "accepted" that payment order. Nothing in law or logic excludes the possibility that CBB *both* "issued" *and* "accepted" the unauthorized order. And it would be bizarre if those two wrongs somehow made CBB's brazen misbehavior right.

Meanwhile, the district court's reference to a "reversal of funds" contravenes its own explicit (and correct) holding that JPMC had not effectively cancelled the original funds transfer because the money had already been credited to Blue Flame's account. *See* JA3081-83 (detailing why "Chain Bridge's obligation to its customer, Blue Flame, cannot be nullified through the cancellation process"). As Article 4A's official commentary explains, "[t]here is no concept of wrongful cancellation or amendment of a payment order. If the conditions stated in [§4A-211] are not met the attempted cancellation or amendment *is not effective*." U.C.C. §4A-211 cmt. 1 (emphasis added). Accordingly, the district court itself had found that CBB's funds transfer to JPMC could not be effected by CBB accepting a cancellation of JPMC's original funds transfer—or by a "reversal of funds," a term Article 4A does not use. It thus had to be accomplished by acceptance of the new payment order that (again, according to the district court itself) had been "issued by Chain Bridge" and not Blue Flame. JA3089.

And so, again, what needs to happen here is clear. The uncontested facts demonstrate that, under §4A-204(a), CBB is obliged to recredit Blue Flame's account with interest, and summary judgment must be entered to that effect. As Article 4A repeatedly recognizes, *e.g.*, U.C.C. §4A-205(a)(3), what happens to the money thereafter is governed by other sources of law, like "the law governing mistake and restitution," and it is doubtful Blue Flame will keep (or even try to keep) it all. But what CBB did here was very obviously wrong as a matter of banking law and practice—the kind of misbehavior that lands one on the "front page of the *Wall Street Journal*"—and the immediate remedy §4A-204(a) requires is unambiguous.

## B. The District Court Erred in Finding Blue Flame's State-Law Claims Preempted.

As to §4A-204(a), the district court got at least one thing right: Neither that provision of Article 4A, nor any other, addresses the remedies that may exist against a party who wrongfully caused the actual issuance of the unauthorized payment order in the first place. But that fact necessarily invalidates the preemption holding the district court reached here.

Under this Court's decision in *Eisenberg*, 301 F.3d at 223, Article 4A (as incorporated into Regulation J, Subpart B) preempts "any state law cause of action premised on conduct falling within the scope of Subpart B, whether the state law conflicts with or is duplicative of Subpart B." *Eisenberg* thus makes clear that "[d]etermining if a state law claim is preempted … turns on whether the challenged

conduct in the state claim would be covered under Subpart B as well." *Id.* Again, the district court did not explain its basis for holding several of Blue Flame's common-law claims "definitely preempted" at the 12(b)(6) stage. JA61. But assuming this Court accepts the district court's (correct) conclusion that a tort or breach of contract that results in the wrongful *issuance* of an unauthorized payment order is not "covered under Subpart B" as such, *see* JA3089 (holding that §4A-204(a) covers "accept[ance]" but not "issu[ance]"), it should reverse the dismissal of Blue Flame's state-law claims and remand with leave for Blue Flame to replead them in accordance with this accepted scope.[5] And, conversely, if this Court concludes that Article 4A *does* cover the wrongful issuance itself, it must reverse the §4A-204(a) judgment against Blue Flame on that score.

Indeed, it is particularly critical that this Court reverse the preemption holding below if it somehow accepts that CBB's conduct is not otherwise prohibited by §4A-204(a). That is because, if the district court is right that: (1) CBB did not "accept" the unauthorized payment order insofar as it issued that order itself; (2) issuing that

---

[5] The district court eventually rejected some state-law causes of action on other grounds. JA3090-92. But Blue Flame tailored its presentation of those causes of action to comply with the apparent scope of the district court's unexplained preemption holding. Once that preemption holding is rejected, Blue Flame must be given leave to replead any and all state-law theories to appropriately address the wrongful issuance of the payment order. Such theories could sound in fraud, breach of contract, tortious interference, or other claims.

unauthorized order is not covered by §4A-204(a); *and* (3) state-law causes of action for that wrongful issuance are still preempted, the upshot will be that banks can wire money out of their customers' accounts willy-nilly by drawing up their own unauthorized payment orders—free from consequences under *either* Regulation J or any other source of authority (given Regulation J's preemptive effect).

This is not and cannot be the law. Instead, Article 4A sets up a plain and simple system where CBB's acceptance of the unauthorized order is regulated by §4A-204(a) and the fraudulent creation of that order remains subject to ordinary common-law remedies. Rejecting either proposition would be incorrect, but rejecting them both is catastrophic. No prior court has ever endorsed anything of the sort, and this Court should not be the first.

## II. The District Court Usurped The Role Of The Jury In Concluding That Blue Flame Could Not "Establish" Damages.

The core obligation of a sender's bank not to execute an unauthorized payment order is mirrored by an equally clear obligation on the beneficiary's bank to actually pay out any payment order it accepts to the intended beneficiary. Section 404(a) thus provides:

> Subject to Sections 4A-211(e), 4A-405(d), and 4A-405(e), *if a beneficiary's bank accepts a payment order, the bank is obliged to pay the amount of the order to the beneficiary of the order.* … If the bank refuses to pay after demand by the beneficiary and receipt of notice of particular circumstances that will give rise to consequential damages as a result of nonpayment, the beneficiary may recover damages resulting from the refusal to pay to the extent the bank had notice of the damages,

unless the bank proves that it did not pay because of a reasonable doubt concerning the right of the beneficiary to payment.

U.C.C. §4A-404(a) (emphasis added).

As the district court concluded, CBB was "obliged to pay the amount of the order" to Blue Flame and didn't. JA3083. But, somehow, the district court nevertheless concluded that there was no genuine issue as to Blue Flame's damages, which (per §4A-404(a)) include consequential damages resulting from such conduct. The district court reached this conclusion by adopting the factfinding role that the Constitution reserves for the jury. Reversal is warranted so that the conflicting evidence can be properly considered and weighed at trial.

## A. The District Court Correctly Found That CBB Violated §4A-404(a).

Unlike with §4A-204(a), the district court's reading of §4A-404(a) was sound. Accordingly, the court correctly concluded that CBB violated §4A-404(a) when it refused to give Blue Flame access to the funds it accepted from JPMC, and instead eventually wired them back. JA3080-83.

It did so by correctly rejecting the proposition that CBB could return the funds through a recall or cancellation by JPMC. First, it observed that "evidence in the record establishes that the funds were 'accepted' because they were credited to Blue Flame's account." JA3081 (citing JA937; JA945; JA2097-98). Then, the district court persuasively dispensed with defendants' misguided argument that §4A-

211(e)—the only one of §4A-404(a)'s "[s]ubject to" escape hatches[6] defendants invoked—gave CBB an excuse for its misfeasance.  JA3081-83.

Section 211(e) provides that, "[i]f an accepted payment order is canceled, the acceptance is nullified and no person has any right or obligation based on the acceptance."  But, as noted above (*supra* p.37), the only kind of cancellation countenanced by Article 4A is "effective" cancellation, U.C.C. §4A-211 cmt. 1, the definition of which is spelled out in §4A-211(c)(2):

> With respect to a payment order accepted by the beneficiary's bank, cancellation or amendment is not effective unless the order was issued in execution of an unauthorized payment order, or because of a mistake by a sender in the funds transfer which resulted in the issuance of a payment order (i) that is a duplicate of a payment order previously issued by the sender, (ii) that orders payment to a beneficiary not entitled to receive payment from the originator, or (iii) that orders payment in an amount greater than the amount the beneficiary was entitled to receive from the originator.

Defendants tried to argue below that "California's payment order initiating the wire transfer was issued by 'mistake' … because California originated the funds transfer only as a result of having been misled about Blue Flame's bona fides as a PPE supplier."  Dkt. 119 at 17.  But any kind of second thought about a payment could be characterized as this kind of "mistake," and neither the Fedwire system nor Article 4A would serve its finality-creating purpose if it were subject to such second

---

[6] The final clause of §4A-404(a) cannot help defendants, because "reasonable doubt concerning the right of the beneficiary to payment" arises *only* where "there is doubt whether acceptance occurred."  U.C.C. §4A-404 cmt. 3.

thoughts. Article 4A treats a transfer as a *transfer*, and so narrowly proscribes the circumstances in which a transfer can be unwound. Those circumstances involve essentially technical errors, and even then require the consent of the receiving bank for cancellation.[7]

This is not a close question. Anticipating arguments like defendants', Article 4A's drafters expressly considered a case like this one and explained that a beneficiary's bank must still pay the beneficiary notwithstanding that bank's alleged fraud concerns. As they put it, "[a] fraud or breach of contract claim of the originator may be grounds for recovery by the originator from the beneficiary *after* the beneficiary is paid, but it does *not* affect the obligation of the beneficiary's bank to pay the beneficiary." U.C.C. §4A-404 cmt. 3 (emphases added). The mistake contemplated by §4A-211(c)(2)(ii) is thus a mistake in the *beneficiary's identity*. *Id.* §4A-211 cmt. 4. The drafters could hardly have communicated more clearly that what CBB did here was "not appropriate," *id.*; a bank cannot withhold the exact right amount from the exact intended beneficiary based solely on (what it says were) its own noble concerns

---

[7] In particular, §4A-211 specifies that either (1) the receiving bank must consent to the cancellation, or (2) a preexisting rule adopted by an association of banks must permit cancellation without its agreement. U.C.C. §4A-211(c); *see also id.* §4A-501 (discussing "funds-transfer system rule[s]"). The receiving bank's consent is necessary because that bank may have already incurred a liability to its customer or the next bank in the chain, and may also wish to avoid jeopardizing its relationship with the beneficiary over a mistake someone else made. *See id.* §4A-211 cmts. 3, 5.

about whether the originator *should have* wanted to send the funds transfer at issue.

This makes perfect sense given banks' "essentially mechanical" role in the funds-transfer system. *See* U.C.C. §4A-104 cmt. 3. Indeed, giving intermediaries some oversight power or discretion to unwind a transfer when they think justice so requires deprives the wire transfer of the certainty and finality it was built to provide. It is thus nonsensical to contend—as defendants did below, Dkt. 119 at 18-20—that some law or other *obligates* banks to step into disputes between senders and beneficiaries and dole out remedies. Accordingly, while defendants spent several pages in the district court claiming that CBB "would have put itself in substantial regulatory jeopardy if it had *refused* [JPMC's] cancellation request and paid Blue Flame," *id.* at 18, they never quite got around to explaining *what* regulation, exactly, they would have violated, or why Regulation J and its preemption provision would not have provided a complete defense.

In fact, defendants have it precisely backwards; CBB would have been safe from any liability whatsoever if it had merely done what Article 4A unambiguously requires. The right choice was easy, and spelled out in the commentary in terms that could not more precisely cover this case. The district court's conclusion that, per the undisputed facts, "Chain Bridge violated §4A-404(a)" was thus perfectly in line with the text of Article 4A and the policy concerns that gave rise to it.

**B.** **The District Court Impermissibly Resolved Factual Disputes and Drew Inferences Against Blue Flame.**

Having read §4A-404(a) correctly, however, the district court then proceeded to overstep its constitutional role on summary judgment by adjudicating factual disputes and questions of credibility. As the Supreme Court has stated—and as this Court has repeatedly stressed—"[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Liberty Lobby*, 477 U.S. at 255; *accord, e.g.*, *Martin v. Duffy*, 977 F.3d 294, 305 (4th Cir. 2020) (citing *Liberty Lobby*); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 649-50 (4th Cir. 2002) (where evidence was "not sufficient to compel a rational jury" to find in the defendant's favor, "[t]o grant judgment as a matter of law … would be to intrude on the jury function by substituting our own judgment for that of the finder of fact").

The district court did not doubt that Blue Flame demanded payment or that CBB was on notice of consequential damages. *See* §4A-404(a) (requiring these elements for a consequential-damages claim). Instead, it held only that Blue Flame could not "establish" any such damages, *id.*, and that its §4A-404(a) claim thus failed. It premised that holding on two factual conclusions: (1) that "even if Chain Bridge had released the disputed funds to Blue Flame on March 26, 2020, California would have ended its relationship with Blue Flame, resulting in the return of the funds, because the evidence in this record *unequivocally* shows that plaintiff could

not fulfill the contract," JA3083-84 (emphasis added); and (2) that "'there is *no record evidence* that Blue Flame would have successfully fulfilled California's order even if Blue Flame had received California's funds,'" JA3085 (quoting Dkt. 119 at 24) (emphasis added). While these conclusions read similarly, they are conceptually distinct in that the first covers the district court's prediction of California's course of conduct in the absence of CBB's §4A-404(a) violation, while the second concerns its forecasting of Blue Flame's performance prospects. But, in any event, serious disputes of fact lurk behind each prophecy.

### 1. The evidence that California would have immediately canceled the entire contract absent CBB's §4A-404(a) violation is equivocal at best.

Only by drawing a chain of inferences *against* Blue Flame was the district court able to arrive at its conclusive prediction that "California would have ended its relationship with Blue Flame, resulting in the return of the funds," regardless of CBB's §4A-404(a) violation. JA3083-84. That is, the district court's conclusion amounts to a supposition that a particular series of events would have taken place— all of them unfavorable to the nonmoving party—if CBB had abided by §4A-404(a) and "pa[id] the amount of the order" to Blue Flame.

1. Regardless of its urgent need for N95 masks, and despite its understanding that Blue Flame (having received the funds) would immediately wire money out to buy masks that were ready to ship, *supra* pp.9-10, California

would unquestionably have decided to terminate the contract. *But see supra* pp.24-25 (detailing California's accommodating approach to its next PPE contract).

2. California would thus have delivered to Blue Flame "a Notice of Termination specifying the extent of the termination and the effective date thereof," JA1165—and it definitely would have specified, without further deliberation, that the *entire* contract was terminated *immediately*. *But see supra* pp.24-25 (California's conduct with BYD); JA690 (deposition testimony by California employee, indicating that the events of March 26 "caused [California] enough concern to … *reconsider*" the arrangement with Blue Flame, but that DGS did not "ha[ve] time to fully deliberate") (emphasis added).

3. Blue Flame would then have been unable to dissuade California from proceeding with immediate, complete termination, even by provision of conclusive evidence that Suuchi's promised shipment of six million N95 masks was underway. *But see* JA2889 (DGS director Kim deposition: The source of the masks was "irrelevant," because California "just needed the product."); JA3012 (DGS officer Wong deposition: "If we received the masks [from Blue Flame] that were agreed upon, *we would have accepted them*.") (emphasis added).

4. Having failed to convince California to maintain a contract to purchase even one mask or delay cancellation by even one day, Blue Flame would have been able to claw back every penny of the funds it had already wired to suppliers. *But see* JA1774 (agreement between GHC and Blue Flame providing that, if Blue Flame terminated the contract, GHC "shall be reimbursed for … costs, plus a reasonable profit for work performed to date of termination"); JA1787 (same, in agreement between Suuchi and Blue Flame).

5. Blue Flame would have had no colorable claim, under contract law or otherwise, to any part of the consideration California provided for its performance, and thus would have had to return the entirety of the $456,888,600 upon demand and without negotiation. *But see* JA1165-66 (standard General Provisions of California procurement contract contemplates a "termination settlement" and provides that "the Contract shall be deemed to remain in effect until" such settlement "is concluded").

At an absolute minimum, this is clearly a complex web of hypothetical future events, many of which depend on principles of contract law the district court did not even seriously consider, let alone decide. But according to the district court, these events—subsumed as they are in the ultimate prediction that "California would have

ended its relationship with Blue Flame, resulting in the return of the funds"—were inevitable and no reasonable juror could have concluded otherwise.

In fact, it's impossible to know for certain what California would have done in an alternate timeline. But it *is* possible to get a fair idea by examining California's conduct in its next major PPE contract, consummated about two weeks after the events here. As noted above, *supra* pp.24-25, BYD missed the deadline to obtain NIOSH certification *twice*, and California extended the deadline *twice* before receiving its first masks in June 2020. It then *renewed* the contract despite BYD's late performance. Such realities demonstrate how wildly overconfident the district court was in its predictive powers when it held that California's hypothetical future actions could not even be reasonably contested. In reality, this is exactly the kind of purely factual question the Constitution allocates to the jury.

### 2. There is substantial evidence Blue Flame would have successfully fulfilled some or all of California's order.

Indeed, it's not clear the district court was even asking the right question in reaching its factual conclusions. The court's analysis suggests a belief that California would *eventually* cancel the contract, and/or that Blue Flame would not deliver *all* 100 million masks. But to grant summary judgment, the court must have believed that Blue Flame could not prove *any damages at all*. Put otherwise, any dispute on the question whether Blue Flame could have delivered six million or 63 million masks within the 30 days the contract contemplated is in fact a dispute about the

*amount* of Blue Flame's damages, not their existence. On the more fundamental question whether Blue Flame was damaged *at all* by CBB's §4A-404(a) violation— that is, whether one supplier would have delivered one N95 mask to California, such that Blue Flame was deprived of *any* profits—the record is bursting with sufficient evidence to preclude summary judgment.

As noted above, *supra* p.11, the record reflects that Blue Flame executed purchase orders with two suppliers, and the evidence further shows that either Suuchi or GHC—and indeed quite likely both—would have delivered N95 masks had Blue Flame been able to keep its end of those agreements. Suuchi had six million masks that were ready to ship immediately upon its receipt of prepayment. JA1767-68; JA1787. California and Blue Flame incorporated this occurrence into their agreement, JA1684-87, and even though it makes no difference on summary judgment (where all that matters is that there is a factual dispute), defendants have proffered no evidence that this shipment wouldn't have happened. Moreover, the payment to Suuchi would have left Blue Flame's account immediately had CBB complied with its obligations under §4A-404(a) and processed the outgoing wire as it had promised. *See supra* p.16. This alone is reason enough to reverse the district court's finding that Blue Flame could establish no consequential damages.

GHC, meanwhile, contracted with Blue Flame to supply 100 million masks over a three-month period. JA1771. The order confirmation GHC sent to Blue

Flame stated that those masks would be "shipped in tranches as often and as soon as possible." *Id.* And as explained in a detailed expert report submitted below, "Blue Flame's supply chain had the capacity to fulfill California's order." JA2790. As Blue Flame's expert explained, "over the first half of 2020," China's manufacturing industry "rapidly ramp[ed] up its production of face masks in general and N95 masks in particular," JA2792, such that, by the time the U.S. began tracking the importation of N95 masks from China in July 2020, China was exporting over 500 million N95 masks per month to the U.S., JA2791. "[W]hile supply was tight and demand was high, during April to June of [2020,] China was adding a tremendous amount of N95 production capacity that would have been sufficient to satisfy an order of 100 million N95 type masks." JA2795. And Henry Huang, GHC's CEO, stated on March 24 that GHC could obtain at least 30 million N95 masks per month for Blue Flame—if Blue Flame made prepayment soon. JA1733 ("[E]veryday its getting harder."); *accord* JA2611-12 (Huang confirming that "GHC had the ability to, and would have, met its obligations … to supply all 100 million masks"). The district court manifestly refused to credit all this evidence in Blue Flame's favor, when the exact opposite is required on a motion for summary judgment.

As this Court has recently admonished, "[a] court improperly weighs the evidence if it fails to credit evidence that contradicts its factual conclusions." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). This is precisely

the error the district court made repeatedly below. Despite deposition testimony that Suuchi's six million masks were ready to ship immediately and Blue Flame's executed purchase order for those masks, the district court found there to be no evidence "that the order[] would have been, or could have been, filled[.]" JA3085. The district court also disregarded Huang's March 24 statements that he could procure at least 30 million N95 masks per month upon prompt prepayment, citing to an email Huang sent *two weeks later*, when circumstances had changed, as Huang himself predicted they would. JA3087. And the decision below relied on Blue Flame's subsequent difficulty in fulfilling PPE orders, JA3087-88, disregarding evidence that defendants' destruction of the California contract *caused* Blue Flame's difficulties through reputational damage and deprivation of working capital, JA2513; JA2516-20; JA2529-31.

The Supreme Court corrected a similar misstep by the Fifth Circuit in *Tolan v. Cotton*, 572 U.S. 650 (2014). Remarking that "this Court is not equipped to correct every perceived error," the Court nevertheless "intervene[d] … because the opinion below reflects a clear misapprehension of the summary judgment standards." *Id.* at 659 (internal quotation marks omitted). Marching through four key factual disputes, the Court carefully reviewed the record, surfaced evidence that contradicted the Fifth Circuit's factual findings—including deposition testimony by interested persons—and reached "the inescapable conclusion that the court below

credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion." *Id.* at 657-59.

A profound misunderstanding of the court's summary-judgment role is also evident in its decision to both exclude and disbelieve a sworn declaration from GHC's CEO Henry Huang, JA2605-14, who was unavailable for a deposition because he was in China, JA2607; JA2844. Federal Rule of Civil Procedure 56(c) expressly contemplates a party's reliance on "affidavits or declarations" to support its position. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(4). And given that a nonmovant succeeds on summary judgment merely by demonstrating that there is a "genuine *dispute* as to any material fact," *id.* 56(a) (emphasis added), a declaration supporting the nonmovant's version of events cannot be discarded simply because it's one-sided, because "it was not produced during discovery," or because "defendants were not able to depose" the declarant, JA3087. Such complaints would make sense in the context of a trial, but they are logically incoherent when the procedural posture requires crediting a witness's story without regard to the defendants' contrary attacks.

But the clearest example of the district court's misapprehension of its summary-judgment role comes from its alternative consideration of this declaration. It couldn't change the outcome, the district court concluded, because it "is inconsistent

with other evidence on the record." JA3087. The court below seemed oblivious, even as it ran through several asserted conflicts between the declaration and defendants' evidence, that it had the standard precisely backwards: Evidentiary "inconsistencies" on key issues are inherently sufficient to *deny* summary judgment, not reasons to grant it. The court's willingness to step into the jury's role is thus evident on the face of its opinion.

### C. The District Court Ignored CBB's Ongoing Violation.

The district court's decision also ignores a very obvious form of "damages" that require sustaining Blue Flame's claim. Section 4A-404(a)'s core legal requirement is that the beneficiary's bank pay the beneficiary *the money itself*; consequential damages are available *on top* of this basic obligation if the bank delays and a forewarned harm to the beneficiary results. Accordingly, the court could not grant summary judgment for lack of damages without requiring CBB to remedy its ongoing failure to meet §4A-404(a)'s demand.

To be sure, Blue Flame's theory has been that, in sending the funds back to JPMC and debiting Blue Flame's account, CBB quite obviously "accepted" an unauthorized payment order, requiring a refund under §4A-204(a). But having found that (1) CBB did *not* "accept" the new and unauthorized order, and (2) JPMC did not effectively cancel the original payment order, the district court was obliged to explain the legal basis on which CBB could continue refusing to tender payment on

that original order. Put another way, §4A-404(a) required CBB to pay Blue Flame, and absent a valid cancellation or a valid transfer of the money back to JPMC, CBB is *still* required to pay Blue Flame. If it was not going to order a refund under §4A-204(a), the district court was thus obliged at an absolute minimum, under its own holdings, to order CBB to stop violating §4A-404(a) without regard to whether Blue Flame could "establish" consequential damages.

## III. Summary Judgment Was Unwarranted On Blue Flame's Tortious-Interference Claims.

For similar reasons, this Court should also reverse the district court's summary-judgment grants on Blue Flame's claims that defendants tortiously interfered with its contract and business expectancy. The district court's main reason for rejecting these claims was the mistaken reasoning on damages discussed above. *See* JA3091. But the court also briefly mentioned two other reasons, both of which only further exemplify the court's overreach on summary judgment.

First, the court said that record evidence revealed "issues" with the proposition that California and Blue Flame had either a contract or a business expectancy. JA3090. But the parties to this case *stipulated* that an agreement had been formed. JA139. And the court's equivocation is nothing like the holding that would have been necessary to grant summary judgment: namely, a finding that, *as a matter of law*, California would have had a valid affirmative defense of fraud in the inducement regarding its agreement with Blue Flame.

Second, the court suggested that there was insufficient evidence of CBB's intent to interfere with the contract. JA3090-91. But there is no other explanation for CBB's repeated calls to California—calls that were wholly out of the ordinary, and made doggedly even after assurances that the transaction was legitimate. *See supra* p.19. In any event, the question on summary judgment is not which side is right, but whether there's *any* evidence for Blue Flame's story. And as noted above, there is plentiful evidence that CBB's real motivation was to unwind a transaction that would have harmed its capital ratios. *See supra* pp.16-18. This Court should reverse on these claims as well.

## CONCLUSION

For the foregoing reasons, this Court should direct judgment for Blue Flame on its §4A-204(a) claim; reverse the dismissal of Blue Flame's state-law claims and remand them for repleading; and reverse and remand Blue Flame's §4A-404(a) and tortious-interference claims for trial.

## REQUEST FOR ORAL ARGUMENT

This case raises several issues of first impression, the resolution of which may have far-reaching economic effects. Blue Flame respectfully requests that the Court set the case for oral argument.

December 22, 2021

Respectfully submitted,

s/ Eric F. Citron

Eric F. Citron
Kathleen Foley
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20814
(202) 362-0636
ecitron@goldsteinrussell.com
kfoley@goldsteinrussell.com

*Counsel for Appellant Blue Flame Medical LLC*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,990 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 2016 in 14-point Times New Roman font.